UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

KYLE B. RICHARDS, #641715,                    Case No. 2:20-cv-122

                              Plaintiff,        Hon. Hala Y. Jarbou
                                                Chief U.S. District Judge
        v.

UNKNOWN PERTTU,

                              Defendant.

_____/

**REPORT AND RECOMMENDATION**

## I.    Introduction

This Report and Recommendation (R&R) addresses whether Plaintiff exhausted

his available administrative remedies prior to filing this lawsuit.    On December 14,

2020, the Court held an evidentiary hearing solely on the exhaustion issue.

Plaintiff — state prisoner Kyle B. Richards — filed suit under 42 U.S.C. § 1983

on June 24, 2020.  In his verified complaint, Richards alleged that while he was confined

at the Baraga Correctional Facility (AMF) in Baraga, Michigan, Resident Unit Manager

(RUM) Perttu ignored and later encouraged prisoner attacks on Richards, in violation

of the Eighth Amendment.[1]

On May 18, 2021, Perttu filed a motion for summary judgment and supporting

brief.  (ECF Nos. 80, 81.)  Perttu argued that Richards failed to pursue any grievances

_____

[1]      Richards's complaint set forth additional claims and allegations, but the Court
dismissed the additional claims in its February 4, 2021 opinion (ECF No. 64) and order
(ECF No. 65).

concerning his claim through Step III of the grievance process, and that Richards therefore failed to properly exhaust the available administrative remedies. (ECF No. 81, PageID.362-363.) Richards responded to Perttu's motion, arguing that RUM Perttu prevented Richards from filing grievances, and that administrative remedies were therefore unavailable to Richards. (ECF No. 84, PageID.461-462.)

In rare circumstances, an administrative remedy will be considered unavailable where officers are unable or consistently unwilling to provide relief, where the exhaustion procedures may provide relief, but no ordinary prisoner can navigate it, or "where prison administrators thwart inmates from taking advantage of a grievance [or other administrative] process through machination, misrepresentation, or intimidation." *Ross v. Blake*, 578 U.S. 632, 644 (2016). Because Richards made specific allegations of thwarting in his response in opposition to summary judgment, which he supported with declarations from various prisoner-witnesses, the undersigned issued an R&R finding that there were genuine issues of material fact as to whether the grievance process was available to Richards and recommending that the Court deny Defendant Perttu's motion. (ECF No. 146, PageID.788-791.) On January 27, 2022, the Court adopted the R&R. (ECF No. 151, PageID.802.)

Meanwhile, on August 31, 2021, pursuant to *Lee v. Willey*, 789 F.3d 673 (6th Cir. 2015), and in anticipation of the Court finding that Richards created a genuine issue of fact as to whether he was thwarted from exhausting his administrative remedies, RUM Perttu requested an evidentiary hearing on the issue of exhaustion. (*See* ECF No. 104, PageID.552 (Minutes of Telephone Status Conference).) Perttu also requested

evidentiary hearings on exhaustion in two other cases involving Richards and Perttu, *Richards et al v. Perttu*, W.D. Mich. Case No. 2:20-cv-76 and *Richards et al. v. Perttu*, W.D. Mich. Case No. 2:20-cv-194, which involved overlapping allegations of thwarting. The Court granted Perttu's requests and scheduled evidentiary hearings in all three cases.[2]  After the November 4, 2021 evidentiary hearing in *Richards et al. v. Perttu*, W.D. Mich. Case No. 2:20-cv-76, Richards and Perttu agreed to incorporate the testimony and exhibits from the hearing into the evidentiary hearing in this case, and to narrow the scope of additional testimony to the time not covered by the November 4th hearing.

The evidentiary hearing in this case was held on December 14, 2022.  Prior testimony and MDOC records admitted during the November 4, 2021 evidentiary hearing in *Richards et al v. Perttu*, W.D. Mich. Case No. 2:20-cv-76, showed that the grievance process was available to Richards in administrative segregation and later in general population.  *See Richards v. Perttu*, No. 2:20-cv-76, 2021 WL 8055485, at \*9 (W.D. Mich. Dec. 3, 2021), *R&R adopted*, No. 2:20-CV-76, 2022 WL 842654 (W.D. Mich.

---

[2]    The evidentiary hearing in this case was initially set for November 4, 2021, the same day as the evidentiary hearing in *Richards et al v. Perttu*, W.D. Mich. Case No. 2:20-cv-76.  (ECF No. 106 (Case Management Order).)  However, the evidentiary hearing in *Richards et al v. Perttu*, W.D. Mich. Case No. 2:20-cv-76 took much longer than anticipated, leading the Court to reschedule the hearing in this case for December 29, 2021.  (ECF No. 142 (Notice Rescheduling Hearing).)  The hearing was again rescheduled to January 20, 2022 (ECF No. 144 (Notice Rescheduling Hearing)) but was then adjourned pending the Court's decision on the undersigned's R&R (ECF No. 147 (Notice Cancelling Hearing)).  After the Court approved and adopted that R&R, the hearing was rescheduled for October 5, 2022 (ECF No. 157 (Case Management Order)) but Defendant soon after filed an unopposed motion to adjourn after being placed on medical leave (ECF No. 161 (Unopposed Motion to Adjourn)).  Once Perttu returned to work, the evidentiary hearing was rescheduled for December 14, 2022.  (ECF No. 168 (Case Management Order).)

Mar. 22, 2022).   But Richards argued that Perttu made the grievance process unavailable by threatening Richards and destroying Richards's grievances or asking other prisoners to destroy the grievances on Perttu's behalf.   Richards called several prisoner witnesses during the November 4, 2021 hearing and the December 14, 2022 hearing who testified that they saw Perttu threaten and harass Richards and tear up Richards's grievances.   In response to these thwarting claims, at the December 14, 2022 hearing, Perttu presented records establishing that some of the prisoner witnesses were not locked in the same location as Richards during the time they alleged to have witnessed Perttu's acts of thwarting, and that Perttu did not enter Richards's housing unit on some of the dates of the alleged thwarting.

The undersigned has considered the exhibits, testimony and argument presented during the December 14, 2022 hearing and, pursuant to the agreement of the parties, during the November 4, 2021 hearing.   The undersigned concludes that Defendants have shown, by a preponderance of the evidence, that the grievance process was available to Richards, and that Richards nevertheless failed to exhaust his administrative remedies. Accordingly, the undersigned respectfully recommends that the Court dismiss Richards's case.

## II.    Exhaustion of Administrative Remedies

A prisoner's failure to exhaust his administrative remedies is an affirmative defense, which Defendants have the burden to plead and prove.    *Jones v. Bock*, 549 U.S. 199, 212-16 (2007).   The district court may resolve disputed issues relating to exhaustion in a bench trial or evidentiary hearing if a defendant's motion for summary

judgment on the issue of exhaustion is denied because "disputed issues of fact regarding exhaustion under the [Prison Litigation Reform Act] present[ ] a matter of judicial administration. . . ." *Lee v. Willey*, 789 F.3d 673, 678 (6th Cir. 2015).  Defendants bear "the burden to plead and prove by a preponderance of the evidence" that the prisoner-plaintiff failed to properly exhaust his or her claims.  *Id.* (citing *Jones v. Bock*, 549 U.S. 199, 218 (2007)).   "The Sixth Circuit has never adopted a burden-shifting approach for the defense of PLRA exhaustion."  *Lamb v. Kendrick*, 52 F.4th 286, 295 (6th Cir. 2022).

Upon a showing of a prisoner's "affirmative efforts to comply with the administrative procedures" a prisoner's failure to comply with the exhaustion requirement *may* be excused.  *Id.* at 293 (citing *Lee*, 789 F.3d at 677.)  Once a prisoner shows affirmative efforts to comply with administrative procedures, the Court must evaluate "whether 'those efforts to exhaust were sufficient under the circumstances.'" *Id.* (citing *Lee*, 789 F.3d at 677.)   In other words, a prisoner "is not automatically absolved from the PLRA's exhaustion requirement" by demonstrating that officials interfered with his pursuit of the relevant administrative remedy; the interference must be sufficient to have rendered the remedy unavailable.  *Id.*  Defendants bear the burden of establishing that the prisoner's efforts were insufficient to excuse the prisoner from the exhaustion requirement.  *Id.*, at 295.

"Within the context of these evidentiary hearings, federal district or magistrate judges can resolve all genuine issues of material fact related to the exhaustion of administrative remedies." *Alexander v. Calzetta*, No. 2:16-CV-13293, 2018 WL 8345148, at *6 (E.D. Mich. Nov. 30, 2018) (citing *Lee*, 789 F.3d at 677-78), *report and*

*recommendation adopted*, No. 16-CV-13293, 2019 WL 1011106 (E.D. Mich. Mar. 4, 2019).[3]  Due to the dispositive nature of the hearing, magistrate judges provide report and recommendations regarding their factual findings and recommendations of law.

The undersigned must resolve the issue of whether Plaintiff failed to properly exhaust his claim against Defendants by a preponderance of the evidence.  *Lee*, 789 F.3d at 677.  At all times, Defendants bear the burden of showing that Plaintiff failed to properly exhaust his claim.  *Lamb*, 52 F.4th at 295.

### III.    Richards's Complaint Allegations

Richards's allegations with respect to his remaining claim are straightforward. Richards says that on February 4, 2020, March 10, 2020, April 5, 2020, May 7, 2020, and June 15, 2020, he was assaulted by other inmates.  (ECF No. 1, PageID.3-4.) Richards says that the prisoners targeted Richards because he is sexually attracted to children.  (*Id.*)

According to Richards, Defendant RUM Perttu responded to the assaults on April 5, May 7, and June 15, 2020, and refused to remove the other prisoners from Richards's vicinity.  (*Id.*, PageID.4.)  Additionally, Richards says that on May 10, 2020, Perttu announced over the housing unit loudspeaker that Richards was a rapist.  (*Id.*,

---

[3]      A survey of district courts shows that magistrate judges routinely preside over exhaustion evidentiary hearings.  *See, e.g., Perry v. Monroe*, No. CIV. 09-239-GPM, 2011 WL 3022229 (S.D. Ill. July 22, 2011); *Alexander v. Salmi*, No. 2:16-CV-96, 2017 WL 3220357 (W.D. Mich. June 27, 2017), report and recommendation adopted, No. 2:16-CV-96, 2017 WL 3190643 (W.D. Mich. July 27, 2017); *Ayotte v. Stemen*, No. 15- 13826, 2019 WL 2219739 (E.D. Mich. Feb. 27, 2019); *Alexander v. Calzetta*, No. 2:16- CV-13293, 2018 WL 8345148, at *6 (E.D. Mich. Nov. 30, 2018), report and recommendation adopted, No. 16-CV-13293, 2019 WL 1011106 (E.D. Mich. Mar. 4, 2019).

PageID.8.)  On June 15, 2020, RUM Perttu allegedly provided another inmate with Richards's mental health records, which detail Richards's sexual attraction to children. (*Id.*) After Richards was attacked on the same day, Perttu allegedly told Richards: "you['re] getting what you deserve."  (*Id.*, PageID.4.)[4]

## IV.  Analysis

During the evidentiary hearing, RUM Perttu provided testimony regarding the general availability of the grievance process at AMF.  Plaintiff Richards then provided testimony as to RUM Perttu's attempts to thwart Richards's exhaustion of the grievance process.  Finally, Defendants provided evidence that Richards was not thwarted from exhausting his claims.

### a.  General Availability of the Grievance Process and Richards's Failure to Exhaust

The following witnesses testified as to the general availability of the grievance process at AMF, and of Richards's failure to exhaust the grievance process:

(1) MDOC Grievance Manager (GM) Richard Russell (testimony on November 4, 2021),

(2) AMF Grievance Coordinator (GC) Thomas Hamel (testimony on November 4, 2021), and

---

[4]    During the December 14, 2022 evidentiary hearing on exhaustion, Defendant Perttu expressed his belief that Richards's remaining claim was based only on Perttu's May 10, 2020 statement and June 15, 2020 act of providing Richards's file to another prisoner.  In other words, Perttu posits that the allegations regarding the prisoner attacks and Perttu's failure to adequately respond to the prisoner attacks predating May 10, 2020 are not a part of Richards's Eighth Amendment claim.  The undersigned respectfully disagrees, but notes that the discrepancy does not materially affect the undersigned's analysis or recommendation.

(3) AMF Inspector Craig Cummings (testimony on November 4, 2021).

The following exhibits were offered, and admitted, as evidence of the same:

(1) Defense Exhibit A – MDOC Policy Directive 03.02.130 (Prisoner Grievances) (admitted on November 4, 2021),

(2) Defense Exhibit B – MDOC Policy Directive 03.03.140 (Prison Rape Elimination (PREA) and Prohibited Sexual Conduct Involving Prisoners) (admitted on November 4, 2021),

(3) Defense Exhibit C-1 – Richards's Step III Grievance Report and Relevant Grievances (admitted on November 4, 2021),

(4) Defense Exhibit C-2 – Richards's AMF Grievance Summary Report (admitted on November 4, 2021), and

(5) Defense Exhibit C-3 – Richards's PREA Grievance Report (admitted on November 4, 2021).

During the November 4, 2021 evidentiary hearing, GM Russell explained the grievance process set forth in Defense Exhibit A. The process involves three steps: the initial Step I grievance, the Step II grievance appeal, and the Step III grievance appeal. Russell explained that Step I grievance forms are available in every housing unit in every MDOC facility. To submit a Step I grievance, prisoners in administrative segregation must ask a staff member to place the grievance form in the mailbox. Prisoners in general population housing units may place the grievance form in the mailbox themselves.

GC Hamel testified that he is the ultimate recipient of all Step I grievances

submitted by AMF prisoners, and that he assigns every grievance an identification code before logging the grievance into a grievance database.  Hamel testified that he has no discretion in processing Step I grievances; he must process every grievance he receives. The only exception is that when a grievance concerns sexual harassment or abuse, GC Hamel forwards the grievance to the PREA Coordinator, Investigator Cummings. Hamel further testified that the Step II and III grievance appeals and responses are also logged into the grievance database, which creates a Prisoner Grievance Summary Report revealing the dates and responses to relevant grievances.

Investigator Cummings testified as to the PREA grievance process.  Cummings walked through the process as outlined in Defense Exhibit B, which involves two steps: the initial Step I grievance, and the Step II appeal.  He explained that a prisoner must obtain a PREA grievance form from the facility staff, and then give the completed form to prison staff in administrative segregation or place the form in the unit mailbox in general population.  Cummings stated that he assigns every PREA grievance an identifier and an investigator, and another staff member then enters the information from the grievance into the AIM database, also known as the Administrative Investigations Management database.

Investigator Cummings also testified that prisoners may lodge PREA complaints against staff verbally or prisoners may call the PREA hotline number posted in every unit.  But, per MDOC Policy Directive 03.03.140 ¶ EE, only written grievances that have been appealed through Step II of the PREA grievance process serve to exhaust a prisoner's claims.  (ECF No. 120-3, PageID.641 (Def's Exh. B).)  Taken together, the

aforementioned testimony of Russell, Hamel, and Cummings establishes that both the grievance process as set forth in MDOC P.D. 03.02.130 and the PREA grievance process as set forth in MDOC P.D. 03.03.140 were generally available at AMF.

Turning then to Richards's exhaustion of the available procedures, GM Russell identified Defense Exhibit C-1 as Richards's Step III Grievance Report.  The Report reflects that between February 4, 2020 and June 24, 2020, when Richards filed this case, Richards filed fourteen grievances unrelated to the present claim.  (ECF No. 139, PageID.735-738 (Def's Exh. C-1).)  It further reflects that Richards filed suit before receiving the Step III response to any of these fourteen grievances.  (*Id.*)  When the grievance process is the proper administrative remedy, a prisoner must wait until he receives the Step III response before filing suit.  *Ross v. Duby*, No. 1:09-CV-531, 2010 WL 3732234, at *1 (W.D. Mich. Sept. 17, 2010) (determining that the plaintiff had not exhausted his claim because the response to his Step III grievance was issued after the complaint was filed).

Investigator Cummings identified Defense Exhibit C-3 as Richards's AIM record.  (ECF No. 120-6, PageID.652 (Def.'s Exh. C-3).)  That record, shown below, reflects that Richards's most recent PREA complaint was made in 2017, while Richards was incarcerated at the Alger Correctional Facility.



(*Id.*)

Taken together, Richards's grievance and AIM records establish that he did not exhaust his claims in accordance with MDOC Policy Directive 03.02.130 or MDOC Policy Directive 03.03.140.  But Richards claims that RUM Perttu prevented him utilizing these processes, rendering them unavailable.

### b. Allegations of Thwarting

After Defendant Perttu provided evidence of the availability of the grievance and PREA grievance process at AMF, Richards called witnesses to testify as to RUM Perttu's efforts to thwart Richards's attempts to exhaust.  Richards posits that he tried to submit relevant grievances on numerous occasions, but that Perttu destroyed his grievances. Given that Richards was able to submit fourteen, unrelated grievances during the relevant time frame, Richards's theory is that Perttu intercepted and screened his grievances, allowing only those unrelated grievances to progress through the grievance process.

Richards called the following witnesses to testify:

(1) Kyle B. Richards (Plaintiff) (testimony on November 4, 2021),

(2) Robert Kissee (testimony on November 4, 2021),

(3) Michael Richard Jackson (testimony on November 4, 2021 and December 14, 2022),

(4) Larry Taylor (testimony on November 4, 2021 and December 14, 2022),

(5) Cleveland Spencer (testimony on November 4, 2021), and

(6) Deliun Kennon-Keyonte Stevenson (testimony on November 4, 2021 and December 14, 2022).

The undersigned did not admit any exhibits from Richards during the November 4, 2021 or December 14, 2022 hearings.  Although Richards attempted to admit witness declarations, the undersigned found that the declarations constituted inadmissible hearsay.

Richards's witnesses alleged that they observed Perttu thwarting Richards's attempts to file grievances, either by intimidating Richards, destroying Richards's grievances, or recruiting the witnesses to destroy Richards's grievances.  During the November 4, 2021 hearing, Richards asked Deliun Kennon-Keyonte Stevenson whether Stevenson watched Perttu throw away grievances with Richards's name on them on March 20, 2020 and March 25, 2020, and whether Perttu told Stevenson to destroy some of Richards's grievances on April 18, 2020 and April 20, 2020.   Stevenson answered in the affirmative.  On cross-examination, Stevenson conceded that when Perttu passed Stevenson's cell on the way to the trash can, Perttu did not slow or come to a stop, and the only writing that Stevenson could discern on the face of the grievances was

12

Richards's name.

Also during the November 4, 2021 hearing, Richards asked Larry Taylor whether he watched Perttu rip up Richards's grievances on April 6, 2020.  Taylor said that he did.  Taylor said that he knew the grievances were Richards's grievances because Taylor and Richards were locked in the same housing unit wing at the time.  When Richards recalled Taylor during the December 14, 2021 hearing, Taylor could not recall specific dates on which he observed Perttu thwart Richards's attempts to file grievance. Instead, he testified that Perttu often made disparaging remarks and did not care about the grievance process in general.  Taylor also conceded that he was unaware of the specific contents of the grievances that Perttu destroyed.

During the November 4, 2021 hearing, Richards asked Cleveland Spencer whether he watched Perttu destroy any grievances.  Spencer said that he did but could not confirm that the grievances in question belonged to Richards.  Nor could Spencer provide specific dates on which he observed Perttu destroy grievances.

During the November 4, 2021 hearing, Richards asked Michael D. Cornelius whether he had watched Perttu destroy any grievances.  Cornelius said that he did, but that he could not say when.  On cross-examination, Cornelius admitted that he did not author the declaration that Richards provided the Court, which bore Cornelius's signature.  Although Cornelius testified that the allegations in the declaration were accurate, he said that he could not remember and did not supply the dates set forth in the declaration.  But during the December 14, 2022 hearing, Cornelius said that he watched Perttu destroy the grievances on May 20, 2020, April 5, 2020, and at some point

in June or July 2020.  When Perttu asked Cornelius how he could tell that the grievances were Richards's grievances, Cornelius said that he could see the ink on the grievances.  When Perttu asked whether Cornelius could see the grievance identifier, Cornelius said that he could.

On November 4, 2021, Michael Richard Jackson testified that Perttu approached Jackson and told him to destroy Richards's grievances on April 18, April 20, March 19, and March 25, and May 20, 2020.  Jackson said that he looked at the grievances and saw that they were authored by Richards.  One of the grievances concerned allegations of sexual harassment against Perttu, but Jackson could not recall the contents of the other grievances.  Jackson said that when Perttu brought the grievances to his cell, he was locking in a different housing unit than Richards, and that he waited until he saw Richards again to give the grievances back.  During the December 14, 2022 hearing, Jackson testified that he watched Perttu approach Richards's cell and tell Richards that he was not going to process any of Richards's grievances, but that he could not remember any particular dates.

Richards also called prisoner witnesses Jesse Powell and Jeremy Allen Lopez to testify during the December 14, 2022 hearing.  Powell testified that he did not recall ever watching Perttu destroy grievances.  When Richards asked whether Powell recalled tendering a declaration stating that he saw Perttu destroy grievances, Powell said that he not.  When Lopez was called to testify, he refused to leave his cell.

Richards declined the opportunity to present additional testimony during the December 14, 2022 hearing.  But during the November 4, 2021 hearing, Richards

testified that on numerous occasions, Perttu destroyed his grievances or otherwise prevented them from being processed.  Richards identified June 15, 2020 as one of the dates that Perttu destroyed his grievances, but testified that he could not specifically identify other dates in the relevant time frame.  For those additional dates, he relied on the testimony of his prisoner witnesses.[5]  When Perttu asked Richards about the witness declarations that he had provided the Court prior to the hearing, Richards admitted that he helped draft most of the declarations.

For the sake of clarity, the specific instances of thwarting alleged by Richards and his witnesses during the November 4, 2021 hearing and the December 14, 2021 hearing are summarized in the table below:

| Witness | Nature of Allegations | Date(s) |
| --- | --- | --- |
| Deliun Kennon-Keyonte Stevenson | Stevenson saw Perttu throw away grievances with Richards's name on them.  Perttu also told Stevenson to destroy some of Richards's grievances. | April 18, 2020, April 20, 2020, March 20, 2020, and March 25, 2020 |
| Larry Taylor | Taylor watched Perttu rip up some of Richards's grievances. | April 6, 2020. |
| Cleveland Spencer | Spencer saw Perttu destroy someone's grievances. | Unknown |
| Michael D. Cornelius | Cornelius watched Perttu destroy some of Richards's grievances. | May 20, 2020, April 5, 2020, and once more in June or July 2020. |

---

[5]     Richards's co-plaintiffs in *Richards et al v. Perttu*, W.D. Mich. Case No. 2:20-cv-76, also had the opportunity to testify at the November 4, 2021 hearing.  Kenneth Damon Pruitt did not present testimony, and Robert Kissee presented testimony about his own attempts to exhaust the grievance process and the PREA grievance process, to no avail.  And like many of the witnesses, Kissee had difficulty with identifying the particular dates that he attempted to file grievances, and the specific content of those grievances.

| Witness | Nature of Allegations | Date(s) |
|---|---|---|
| Michael Richard Jackson | Perttu approached Jackson and told him to destroy Richards's grievances. | April 18, April 20, March 19, and March 25, and May 20, 2020. |
| Kyle B. Richards (Plaintiff) | Perttu destroyed Richards's grievances. | June 15, 2020 and other unspecified dates. |

### c. Merit of Thwarting Allegations

After Richards called his witnesses to testify as to the alleged thwarting, RUM Perttu testified.  The Court admitted the following exhibits during Perttu's testimony:

(1) Defense Exhibit F – Prisoner Lock Histories (admitted on December 14, 2022),

(2) Defense Exhibit G – RUM Perttu's Time Sheet (admitted on December 14, 2022), and

(3) Defense Exhibit H – RUM Perttu's Tracker Information (admitted on December 14, 2022).

During the November 4, 2021 hearing, RUM Perttu testified that he has been an MDOC employee for twenty-five years, and a RUM at AMF since 2019.  Perttu said that up until July of 2020, he was the RUM for the administrative segregation housing units, Units One through Three.  In July of 2020, he became the RUM for the general population housing units.

Perttu testified that his shift at AMF runs from 7:00 a.m. to 3:30 p.m.  As a RUM, Perttu is required to conduct rounds in his units.  The MDOC requires him to track his rounds via an electronic wand, which he scans as he passes each individual cell.  Data from the wand is automatically uploaded into a database.  RUM Perttu reported that if prisoners in administrative segregation had mail for him to collect during rounds, he

would take it and fold it over, so that no other prisoners could see its contents, and then separate it in the Prison Counselor's office before placing it in the relevant mailbox. But Perttu stated that the prisoners' mail is usually collected by their Prison Counselors. And Perttu stated that he does not have access to the housing unit mailboxes, or to the mailroom absent the presence of mailroom staff.

RUM Perttu then explained the way that AMF is set up. According to Perttu, all of the administrative segregation housing units are in separate buildings. The individual buildings are shaped like a "V" with A wing and B wing on one side, and C wing and D wing on the other. Perttu testified that when he did collect mail, he did not carry mail from one unit to another, nor did he mix mail between wings.

At the December 14, 2022 hearing, Perttu clarified that during the time he was assigned to Units One through Three, he only found himself in Units Four or Five if there was a staff shortage. Those exceptions were recorded by his wand, which he still carried and scanned during rounds as required.

Also during the hearing, Perttu discussed Defense Exhibits F, G, and H. Perttu explained that Defense Exhibit F is the compiled lock histories of Richards and his prisoner witnesses. (ECF No. 171-1.) Exhibit G is Perttu's timesheet for the relevant time period. (ECF No. 171-2.) And Exhibit H is the data from Perttu's wand, demonstrating when he scanned the wands at each cell during his rounds, and which housing units he conducted rounds in on a given date. (ECF No. 171-3.)

Turning to Exhibit F, the undersigned first notes Richards's own lock history undermines his theory. Richards's lock history demonstrates that from October 9, 2019

17

to May 11, 2020, Richards locked in administrative segregation in Unit Three, cell 229T. (ECF No. 171-1, PageID.886.)  On May 11, 2020, Richards was transferred to Unit Four, cell 239T *in general population*.  (*Id.*)  Perttu's witnesses testified that grievance forms are available in each housing unit at AMF.  They also testified that while prisoners in administrative segregation must hand their grievances to unit staff for submission, prisoners in general population can place their grievances directly in the housing unit's mailbox — a mailbox which is locked, and to which Perttu does not possess a key.  Even assuming that Perttu worked around the clock to be the staff member collecting Richards's grievances from administrative segregation, from May 11, 2020 on, Richards had the option to place his grievances in the unit mailbox himself.  Once those grievances were in the mailbox, they were beyond Perttu's reach.  And it is worth noting that the dates on which Richards alleges RUM Perttu encouraged other prisoners to attack Richards were just before (May 10, 2020) and long after (June 15, 2020) Richards was transferred to general population; Richards could have submitted grievances regarding these incidents directly to the Unit Four mailbox.

The lock history of Richards's prisoner witnesses further undermines Richards's theory, and the witness testimony he presented.  From October 9, 2019 to March 30, 2020, Michael D. Cornelius locked in Unit Three, cell 138B.  (*Id.*, PageID.888.)  From March 30, 2020 on, Cornelius locked in Unit Four, cell 231T.  (*Id.*)  From December 12, 2019 to May 11, 2020, Larry Taylor locked in Unit Three, cell 207T.  (*Id.*, PageID.892.)  From May 11, 2020 on, Taylor locked in Unit Four, cell 231T.  (*Id.*)  And Jackson's lock history demonstrates that he never locked in Unit Three, or in Unit Four during the

18

relevant dates. (*Id.*, PageID.889.) Although Exhibit F did not include the lock histories of Stevenson or Spencer, Perttu testified during the November 4, 2021 hearing that he did not believe Stevenson or Spencer were locked near Richards during the relevant dates.

Despite these lock histories, Cornelius testified that on April 5, 2020, he saw Richards attempt to submit grievances to Perttu.  He said that he then watched Perttu harass Richards and throw away the grievances.  But on April 5, 2020, Richards locked in Unit Three, and Cornelius locked in Unit Four.  And though Jackson conceded during the December 14, 2022 hearing that he never locked in the same unit as Richards, his allegations would require Perttu to take grievances from Richards's segregation cell in Unit Three and carry them to Jackson's general population cell in Unit Five on April 18, April 20, March 19, and March 25, 2020, and to take grievances from Richards's general population cell in Unit Four to Jackson's new general population cell in Unit Five on May 20, 2020.  This would require RUM Perttu to closely monitor each of the prisoners' cell locations, regardless of whether the cells were in Perttu's units, and would require Perttu to carry mail between housing units, something Perttu said that he does not do.  Jackson's lock history also contradicts Jackson's allegation that he observed interactions between Perttu and Richards during the relevant time frame.

But the lock histories are not the only records that undermine the witnesses' testimony.  The data from Perttu's wand reflects that despite Cornelius's allegation that he watched Perttu destroy Richards's grievances on May 20, 2020, Perttu did not enter Cornelius and Richards's housing unit that day.  (ECF No. 171-3, PageID.913 (Def's

19

Exh. H).)   Nor did Perttu enter Richards's housing unit on June 15, 2020, the only specific date that Richards provided when testifying as to Perttu's alleged thwarting. (*Id.*, PageID.921.)

Even setting these exhibits aside, the testimony of Richards's witnesses bore indicia of unreliability.  For example, during Richards's direct examination of several of his witnesses on November 4, 2021, Richards's relied on yes or no questions in which he provided the date and details of Perttu's alleged destruction of grievances, and the witnesses simply agreed.  This form of questioning did not provide Plaintiffs' witnesses the opportunity to develop their testimony independently or demonstrate personal knowledge of the incidents.  Indeed, when Perttu objected to the form of questioning and Richards began asking open-ended questions, the witnesses were unable to provide specific dates of thwarting.

Significantly, Cornelius admitted during the November 4, 2021 hearing that he could not recall specific dates on which he observed Defendant Perttu destroying Richards's grievances, and that the dates in an earlier declaration were supplied by Richards.  Richards admitted that he assisted in authoring the majority of his prisoner-witnesses' declarations.  But then, during the December 19, 2022 hearing, Cornelius identified April 4, 2020 and May 20, 2020 as the dates on which he observed Perttu threaten Richards and destroy Richards's grievances; the same dates reflected in Cornelius's declaration. (*See* ECF No. 116-1, PageID.605 (Cornelius's Declaration).) And when Richards called Powell to testify for the first time during the December 19, 2022 hearing, Powell denied ever witnessing Perttu destroy Richards's grievances, or

authoring a declaration stating that he did, despite the declaration that Richards had filed along with his motion for writ of habeas corpus. (*See* ECF No. 158-1, PageID.828-829 (Powell's declaration).)

In addition to the form of questioning and the witnesses' inability to recall the particular dates on which they observed RUM Perttu thwarting Richards's attempts to exhaust the grievance process, or that they observed such thwarting at all, the circumstances under which the witnesses' observations were made undermine their allegations. For example, Stevenson and Cornelius say that they were able to see Richards's name on the grievance forms that Perttu ripped up or threw away. But the data from Perttu's wand reflects that he passed as many as eleven cells in one-minute when he was on rounds (*see* ECF No. 171-3, PageID.901), and Stevenson admitted that Perttu passed his cell at full-stride. As such, these witnesses would have had mere seconds to glance at any grievances Perttu held as he passed their cell. And while Stevenson said that Richards's name was the only thing he could read on the grievances as Perttu passed by, Cornelius said that he was able to see even the grievance identifiers at the top of the grievance forms; identifiers that Hamel testified are only added to grievances once they have been submitted and processed at Step I. It is also worth noting that Jackson was the only witness who testified as to the contents of the allegedly destroyed grievances. Jackson said that some of the grievances concerned sexual harassment but made no mention of the allegations underlying Richards's remaining claim.

Ultimately, the evidence before the Court highlights the far-fetched nature of

Richards's theory that Perttu single-handedly intercepted and reviewed every grievance Richards submitted over the course of five months, only allowing the submission of grievances unrelated to Richards's present claim.  The witnesses who claimed to have observed Perttu targeting and destroying Richards's grievances provided unreliable testimony.  And the record reflects that even if Perttu tried to intercept Richards's grievances, Richards could have submitted grievances to other prison staff in administrative segregation.  The record further demonstrates that Richards could have placed his grievances directly in his housing unit's mailbox once he entered general population.  But by all indications on the record, Richards neglected to take these steps.  As such, to the extent that Richards made affirmative efforts to exhaust the available administrative remedies, those efforts were insufficient to exhaust under the circumstances presented.  *Lee*, 789 F.3d at 677 ("When a prisoner makes affirmative efforts to comply but does not succeed, we analyze 'whether those efforts to exhaust were sufficient under the circumstances.'" (quoting *Risher v. Lappin*, 639 F.3d 236, 240 (6th Cir.2011))).  For these reasons, the undersigned finds that Defendants have sustained their burden of establishing that Richard failed to exhaust his administrative remedies.

### V.   Conclusion and Recommendation

The undersigned concludes that Defendants have shown, by a preponderance of the evidence, that the grievance process was available to Richards, and that Richards was not thwarted from filing grievances against RUM Perttu.  Nevertheless, Richards failed to exhaust his administrative remedies.  Accordingly, the undersigned

respectfully recommends that the Court dismiss this case.[6]

Date:      December 30, 2022                    /s/ *Maarten Vermaat*
                                               MAARTEN VERMAAT
                                               U. S. MAGISTRATE JUDGE


## NOTICE TO PARTIES

Any objections to this Report and Recommendation must be filed and served within fourteen days of service of this notice on you.  28 U.S.C. § 636(b)(1)(C); Fed. R. Civ. P. 72(b). All objections and responses to objections are governed by W.D. Mich. LCivR 72.3(b). Failure to file timely objections may constitute a waiver of any further right of appeal. *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *see Thomas v. Arn*, 474 U.S. 140 (1985).

---

[6]     The undersigned notes that this R&R does not eliminate or otherwise alter the deadlines set forth in the Court's case management orders dated October 12, 2022 (ECF No. 166) and October 14, 2022 (ECF No. 167).  The discovery deadline, dispositive motion deadline, and hearing dates set forth in those orders remain in effect.